**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| **MARY SMITH,** *et al.*,<br><br>              **Plaintiffs,**<br><br>**v.**<br><br>**BOARD OF EDUCATION OF**<br>**FREDERICK COUNTY, MARYLAND,** *et*<br>*al.*,<br><br>              **Defendants.** | **Civil Action No. 1:17-cv-02302-ELH** |

<u>**MEMORANDUM IN SUPPORT OF DEFENDANTS'**</u>
<u>**MOTION TO DISMISS PLAINTIFFS' COMPLAINT**</u>

Donald English, Jr. (Bar No. 27534)
Keith D. Hudolin (Bar No. 13688)
Jackson Lewis P.C.
2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland 21209
410.415.2000 (T)
410.415.2001 (F)
Donald.English@jacksonlewis.com
Keith.Hudolin@jacksonlewis.com

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION .................................................................................................. 1

II.    FACTUAL BACKGROUND ................................................................................. 3

    A.   The State and Federal Governments Encourage Schools To Adopt Policies That Protect Transgender Students. .............................................................. 3

    B.   Courts Affirm The Rights Of Transgender Students In Schools. ......................... 5

    C.   The Frederick BOE Adopts Policies To "Creat[e] Welcoming and Affirming Schools For Transgender And Gender Nonconforming Students." ...................... 6

    D.   Plaintiffs Fail To Allege That The Frederick BOE's Policies Had A Tangible Effect On Them. ................................................................................................... 8

III.   PLAINTIFFS LACK STANDING. ....................................................................... 9

    A.   Rule 12(b)(1) Legal Standard ............................................................................. 9

    B.   Plaintiffs Do Not Allege A Concrete And Actual Or Imminent Injury In Fact That Is Traceable To The Policies. ................................................................... 10

    C.   Plaintiffs Lack Standing To Assert A First Amendment Claim. ........................ 12

IV.   THE COMPLAINT FAILS TO STATE A CLAIM. .......................................... 14

    A.   Rule 12(b)(6) Legal Standard ........................................................................... 14

    B.   Count One Fails To State A Claim For Violation Of A Constitutional Right To Privacy. .......................................................................................................... 14

        1.   There Is No Constitutional Right To Not Share Restrooms And Locker Rooms With Transgender Students. ......................................................... 15

        2.   Even If There Were Such A Right, The Policies Do Not Infringe On It. . 18

        3.   The Policies Do Not Shock The Conscience. ........................................... 18

    C.   Count Two Fails To State A Claim For Violation Of Title IX. ........................... 19

        1.   Plaintiffs Have Not Alleged Harassment Based On Sex. ......................... 20

        2.   Plaintiffs Have Not Alleged Severe, Pervasive, Or Objectively Offensive Harassment. .............................................................................................. 20

    D.   Count Three Fails To State A Claim For Invasion Of Privacy – Intrusion Upon Seclusion. ......................................................................................................... 21

    E.   Count Four Fails To State A Claim For Violation Of The First Amendment. ..... 23

        1.   The Policies Do Not Prohibit Plaintiffs From Voicing Their Opinion On Any Issue, Including Gender Identity Issues. ........................................... 24

        2.   The First Amendment Does Not Give Plaintiffs The Right To Target Transgender Students For Harassment By Intentionally Calling Them By Incorrect Names And Pronouns. .............................................................. 24

F.      Count Five Fails To State A Claim For Violation Of The Fourteenth Amendment. .................................................................................................................... 25

G.      Count Six Fails To State A Claim, Because Policies 443 and 447 Do Not Violate The Separation of Powers Doctrine. ..................................................................... 27

H.      Count Seven Fails To State A Claim, Because Allowing Transgender Students To Use Facilities Consistent With Their Gender Identities Does Not Violate Applicable Building Codes. .................................................................................. 29

I.      Count Eight Fails To State A Claim For "Unconstitutionality of State Statutes And Board of Education Policies 437 and 443." ................................................... 30

V.      CONCLUSION ............................................................................................................ 31

Defendants, Board of Education of Frederick County, Maryland (the "Frederick BOE") and its President, Brad W. Young; its Vice President, Liz Barrett; its members, Michael Bunitsky, Colleen Cusimano, Ken Kerr, April Miller, and Joy Schaefer; and the Superintendent of the Frederick County Public Schools, Theresa R. Alban (collectively, "Defendants"),[1] submit this Memorandum in Support of their Motion to Dismiss Plaintiffs' Complaint.

## I.    INTRODUCTION

It is easy to treat those similar to us the way we would want to be treated; it is more difficult to afford that same reciprocity to those who we perceive to be "different." The policies at issue in this case facilitate an environment in the Frederick County Public Schools where everyone is treated with the same respect and dignity. The simple question before this Court is whether those policies, which, among other things, permit transgender and gender nonconforming students to use facilities that align with their gender identity, are illegal. Put another way, is there a legal right for students to exclusively share school facilities only with other students who were assigned the same sex at birth? The answer to that question is a resounding no.

In June 2017, the Frederick BOE adopted Policy 443, titled "Creating Welcoming and Affirming Schools for Transgender and Gender Nonconforming Students,"[2] with the stated purpose of "prevent[ing] discrimination, stigmatization, harassment, and bullying of students who are transgender or who are gender nonconforming and to create school cultures that are safe,

---

[1] The Complaint also purports to name "Frederick County Public Schools" as a defendant, but the school district does not exist as a legal entity separate from the Board of Education. *See Adams v. Calvert Cty. Pub. Sch.*, 201 F. Supp. 2d 516, 520 n.3 (D. Md. 2002) ("Plaintiff contends that the school district, and not the board of education, is the Defendant. The school district, however, does not exist as a separate entity for purposes of suit. . . . Thus, to be viable at all, the suit against the [the school district] must be treated as a suit against the [board of education].").

[2] For simplicity, this memorandum will generally refer to "transgender" students, although the legal analysis of Plaintiffs' claims is the same with respect to transgender students and other gender non-conforming students.

welcoming, and affirming for all students." Policy 443, attached hereto as Exhibit 1, at 443.1.[3] Among other things, Policy 443 allows students to use bathrooms, locker rooms, and other facilities in a manner consistent with their gender identities. *See id.* at 443.6-443.7. Policy 443 also provides privacy and confidentiality rights for transgender students and directs staff to use students' preferred names and pronouns in their interactions with students. *Id.* at 443.4-443.5. The Frederick BOE also enacted Regulation 400-36 to further clarify Policy 443, *see* Regulation 400-36, attached as Exhibit 2, and made minor revisions to its existing Policy 437, titled "Bullying—Harassment—Intimidation," a copy of which is attached as Exhibit 3. Policy 437, Policy 443, and Regulation 400-36 are referred to collectively herein as the "Policies."

Plaintiffs in this lawsuit have not identified themselves,[4] but they are purportedly a student at a Frederick County high school ("Minor Plaintiff") and her mother ("Parent Plaintiff"). Complaint ¶¶ 12-13. They assert that the protections for transgender students in the Policies "evoke imagery from the horrors of Nazi death camps" and are "like a sad chapter from the history of the child cults Soviet Komsomol or Young Pioneers in the failed USSR." Complaint ¶¶ 24, 90. Plaintiffs challenge various aspects of the Policies under eight separate constitutional, statutory, and common law theories. As described below, each theory fails as a matter of law and should be dismissed with prejudice for failure to state a claim. Plaintiffs' claims also fail at a

---

[3] Policy 443 is attached to the Complaint as Exhibit C, and thus the Court may properly consider it on a motion to dismiss. *See Philips v. Pitt County Mem. Hops.*, 572 F.3d 176, 180 (4th Cir. 2009) ("We may also consider documents attached to the complaint, . . . as well as those attached to the motion to dismiss, so long as they are integral and authentic."). The same is true of Regulation 400-36 and Policy 437, both of which are attached to the Complaint and, for convenience, attached as exhibits to this memorandum.

[4] Despite filing their lawsuit under pseudonyms, Plaintiffs have not moved for leave to proceed under pseudonyms. They are thus violating Federal Rule of Civil Procedure 10(a), which states that "[t]he title of the complaint must name all the parties." *See Doe v. The New Ritz, Inc.*, Case No. WDQ-14-2367, 2015 U.S. Dist. LEXIS 91845, at *4-5 (D. Md. July 14, 2015) (noting that courts may allow parties to proceed anonymously only in "exceptional circumstances"). Further, they have not provided Defendants with copies of the sealed declarations purportedly attached as exhibits to their Complaint.

more fundamental level—Plaintiffs lack standing, because they do not allege any actionable harm they have suffered as a result of the Frederick BOE adopting the Policies. Indeed, there is no allegation that Minor Plaintiff has ever once used a bathroom or locker room at any Frederick County public school at the same time as a transgender student, or even that Plaintiffs know of any transgender students who attend her high school. Accordingly, and as described more fully below, the Court should dismiss the Complaint with prejudice.

## II.    FACTUAL BACKGROUND

### A.    The State and Federal Governments Encourage Schools To Adopt Policies That Protect Transgender Students.

Issues relating to the treatment by schools of their transgender students have gained increased attention over the last few years. For example, in October 2015, the Maryland State Department of Education ("MSDE") issued a report titled "Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination," a copy of which is attached as Exhibit 4.[5] This report noted the clear need for schools to address the problems faced by transgender students:

> According to a 2011 report from the National Center for Transgender Equality and the National Gay and Lesbian Task Force, 132 Maryland respondents who expressed transgender identity or gender nonconformity while in grades K-12 reported alarming rates of harassment (81percent), physical assault (38 percent) and sexual violence (16 percent). A staggering 43 percent reported that they had attempted suicide at some point in their life, 27 times the rate of the general population of 1.6 percent. Harassment was so severe that it led 6 percent to leave a school in K-12 settings or leave higher education. In addition, the Gay, Lesbian, and Straight Education Network (GLSEN, 2014) reports that students who experienced high levels of victimization based on gender expression were twice as likely as students who did not experience high levels of victimization to report that they did not plan to pursue post-secondary education.

---

[5]   When considering a Rule 12(b)(6) motion to dismiss, the Court "may properly take judicial notice of matters of public record." *Philips*, 572 F.3d at 180. The Court may thus consider this report and other documents published by the Maryland and United States Departments of Education without converting this motion to one for summary judgment.

Rather than focusing on their education, many transgender[] and gender non-conforming students struggle for the ability to come to school and be themselves. The National Center for Transgender Equality reports that 59 percent of transgender students have been denied access to restrooms consistent with their gender identity. Some are denied opportunities to go on field trips or participate in sports. Together with bullying and victim-blaming, these conflicts can lead to disproportionate discipline and involvement in the juvenile justice system.

*Id.* at 6.

At the federal level, the United States Department of Education ("US DOE"), through its Office for Civil Rights, issued an opinion letter on January 7, 2015, a copy of which is attached as Exhibit 5, and, in partnership with the United States Department of Justice, issued a "Dear Colleague" letter on May 13, 2016, a copy of which is attached as Exhibit 6. These letters state that Title IX's prohibition on sex discrimination includes discrimination based on gender identity, that schools should use names and pronouns consistent with students' gender identities and, that schools "must allow transgender students access to [restroom and locker room] facilities consistent with their gender identity." *Id.*

The Dear Colleague letter attached a separate report from the US DOE's Office of Elementary and Secondary Education titled "Examples of Policies and Emerging Practices for Supporting Transgender Students," a copy of which is attached as Exhibit 7 (the "US DOE Report"). The US DOE Report answers a wide range of questions that school districts might have about transgender students and gives examples of how other school districts around the country have approached issues related to transgender students. For example, the US DOE Report positively cites school district policies that encourage the use of students' preferred names and pronouns, that allow students to access restrooms and locker rooms that are consistent with their gender identities, and that provide alternative facilities for students who might be uncomfortable sharing facilities with transgender students. *Id.* at 5, 7-8.

Following the recent change in administration, the US DOE withdrew its opinion letter and Dear Colleague letter, but it did not withdraw the US DOE Report. (*See* February 22, 2017 Dear Colleague Letter, attached as Exhibit 8.) In withdrawing the two letters, the US DOE stated that it believes "there must be due regard for the primary role of the States and local school districts in establishing educational policy." *Id.*

### B. Courts Affirm The Rights Of Transgender Students In Schools.

At the same time as the State and Federal Governments were issuing guidance regarding the treatment of transgender students, lawsuits filed by transgender students worked their way through the courts. Those students challenged policies that excluded them and other transgender students from school activities and from using facilities consistent with their gender identities. In these cases, a number of courts have held that Title IX's prohibition on discrimination on the basis of sex and the Fourteenth Amendment's Equal Protection Clause require that school districts allow students to participate in school activities and use facilities such as bathrooms and locker rooms in a manner that is consistent with their gender identities. *See, e.g., Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) (holding that "[a] policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX" and that the plaintiff also "demonstrat[ed] a probability of success on his Equal Protection Claim"); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267 (W.D. Pa. 2017) (granting preliminary injunction allowing transgender students to use restrooms consistent with their gender identity and finding a likelihood of success on the merits of the plaintiffs' equal protection claim); *Bd. of Educ. of the Highland Local Sch. Dist. V. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016) (granting preliminary injunction allowing a transgender girl to

use the girls' restroom because she was likely to succeed on her Title IX and Equal Protection claims).[6]

### C. The Frederick BOE Adopts Policies To "Creat[e] Welcoming and Affirming Schools For Transgender And Gender Nonconforming Students."

Against this backdrop, and in light of the US DOE's recognition of the "primary role of the States and local school districts in establishing educational policy," (Exhibit 8), the Frederick BOE adopted Policy 443 in June 2017 "to prevent discrimination, stigmatization, harassment, and bullying of students who are transgender or who are gender nonconforming and to create school cultures that are safe, welcoming, and affirming for all students." Exhibit 1 at 443.1. The Board continued discussions regarding this Policy over the summer, leading to adoption on August 23, 2017 of the version of Policy 443 that is now before the Court. *See id.*

Policy 443 "is designed to provide an overarching framework and assurances that all students will be safe, welcomed, and affirmed." *Id.* at 443.3. With respect to privacy and confidentiality, it states:

> FCPS respects the rights of students to express their gender identity or expression as they wish. Transgender and gender nonconforming students have the right to discuss and express their gender identity and expression openly and to decide where, when, and with whom to share private information. The fact that a student may wish to use a different name or pronoun at school, or to disclose their transgender or gender nonconforming status to school staff, does not authorize school staff to disclose a student's personally identifiable or medical information. FCPS will ensure all personally identifiable and medical information relating to transgender and gender nonconforming students will be kept confidential according to applicable federal, state and local privacy and student records laws.

---

[6] Courts routinely "look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007). In the Title VII and employment discrimination contexts, a number of Courts have held that discrimination against transgender individuals is discrimination on the basis of sex. *See, e.g., Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187, 1201–02 (9th Cir. 2000).

*Id.* at 443.4. This is consistent with the best practices outlined in the guidance from the MSDE (Exhibit 4 at 11) and the US DOE Report (Exhibit 7 at 4).

Policy 443 also "recognizes the right of every student to be referred to by their preferred name and pronoun" and directs staff who work with students to use students' preferred names and pronouns, "in every interaction, unless the interaction could compromise student privacy." *Id.* at 443.5(a). This is the approach recommended by both the MSDE and the US DOE. *See* Exhibit 4 at 10; Exhibit 7 at 5.

With respect to gender-segregated facilities, such as bathrooms and locker rooms, Policy 443 states:

> Students, including non-binary students, should determine which facilities are consistent with their gender identity. All students must have access to facilities, including rest rooms, locker rooms, or changing facilities, that correspond to their gender identity. Access is provided without any additional complicating procedure.
>
> Any student, regardless of gender or gender identity or expression, who is uncomfortable for any reason using a gender-segregated facility will be provided a safe and nonstigmatizing alternative. Options include, but are not limited to, privacy curtains, provisions to use private restrooms or office restrooms, or a separate changing schedule. These options are provided to any student without question or complicating procedures required. Under no circumstance is any student required or directed to use a private use facility.

*Id.* at 443.6. Once again, this is the approach recommend by the MSDE and in the US DOE Report. *See* Exhibit 4 at 13-14; Exhibit 7 at 7-8.

The Frederick BOE also adopted Regulation 400-36 to clarify and implement Policy 443. *See* Exhibit 2. Among other things, it clarifies that "FCPS will ensure all personally identifiable and medical information relating to transgender and gender nonconforming students will be kept confidential according to applicable federal, state and local privacy and student records laws." *Id.* at II(F). It also clarifies how FCPS will involve parents of transgender students:

> Every effort shall be made to encourage and support communication between transgender and gender nonconforming students and the student's parent/guardian. School staff may offer to meet jointly with the parent/guardian and the student at school. School staff shall work to both support student needs as well as respect the rights of the parent/guardian to have access to student records in compliance with federal and state law. Parents/Guardians will be contacted any time there is a health or safety concern regarding the student.

*Id.* With respect to gender-segregated facilities, Regulation 400-36 clarifies that, "[i]f there is a credible basis for believing that the student is not asserting their authentic gender identity for the purpose of being disruptive or infringing on the rights of others, school administration has the responsibility to investigate as they would for any other behavior that is being disruptive and follow up with the student and/or parent accordingly." *Id.* at II(G).

Finally, the Frederick BOE made minor revisions to its existing Policy 437, which defines and prohibits bullying, harassment, and intimidation. *See* Exhibit 3. Relevant to this matter, the Frederick BOE added "gender expression" to a list of protected classes in Policy 437 that already included sex, sexual orientation, and gender identity. *Id.*

### D.    Plaintiffs Fail To Allege That The Frederick BOE's Policies Had A Tangible Effect On Them.

Plaintiffs do not allege that Minor Plaintiff has ever shared a bathroom or locker room with another student, that Defendants have withheld any information about Minor Plaintiff from Parent Plaintiff, or that Plaintiffs have suffered any repercussions for failing to use the proper pronouns to identify a student. Indeed, Plaintiffs do not allege that the new policies have impacted them in any way, other than "anxiety" over how the policies might impact them and self-inflicted exclusion from school activities as a result of that anxiety. *See*, *e.g.*, Complaint ¶¶ 46, 55, 62, 75.

Plaintiffs allege that "[o]ne child videoed minor Plaintiff and her friends in various stages of undressing in the bath facility during PE and uploaded it to the internet, while in school."

Complaint ¶45. But they do not allege that this incident related in any way to Policy 443 or to transgender students. In fact, the Complaint implies that this incident occurred <u>before</u> the Frederick BOE adopted Policy 443. Further, Plaintiffs do not allege that the child who videoed Minor Plaintiff was transgender or that there were any transgender students present at the time of this incident. This silence suggests the incident involved a cisgender student, which belies the stereotype of transgender students on which Plaintiffs' arguments rest.[7] Specifically, Plaintiffs appear to be assuming that transgender and gender non-conforming students can reasonably be expected to engage in misconduct of this sort if they are allowed to use facilities consistent with their gender identities. There is no basis for this offensive assumption.

## III.  PLAINTIFFS LACK STANDING.[8]

### A.  Rule 12(b)(1) Legal Standard

Defendant's motion is made, in part, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Standing is a threshold jurisdictional question which ensures that a suit is a case or controversy appropriate for the exercise of the courts' judicial powers under the Constitution of the United States. *Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001) "A court does not have subject matter jurisdiction over an individual who does not have standing." *Atlantigas Corp. v. Columbia Gas Transmission Corp.*, 210 Fed. App'x 244, 247 (4th Cir. 2006). "In a Rule 12(b)(1) motion, the court may look beyond the pleadings and 'the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether

---

[7]  "Cisgender is a term describing individuals whose gender corresponds with the legal sex they were assigned at birth." *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1120 n.9 (N.D. Cal. 2015) (internal citations omitted).

[8]  While Plaintiffs' do not have standing, they may seek to amend the Complaint to add specific allegations of interactions with transgender or gender non-conforming students. As a result, Defendants encourage the Court to also rule on the arguments raised in connection with the Rule 12(b)(6) motion to avoid unnecessary further motions practice and waste of judicial resources. This case turns on whether there is a legal right for students to exclusively share school facilities with other students who were assigned the same sex at birth and the Court will have all of the information it needs to make that determination upon the conclusion of the briefing on this Motion.

in fact subject matter jurisdiction exists.'" *Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003). "It is the plaintiff's burden to prove that jurisdiction in this court is proper." *Id.*; *see also Richmond, Fredericksburg, & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

**B.      Plaintiffs Do Not Allege A Concrete And Actual Or Imminent Injury In Fact That Is Traceable To The Policies.**

"It is well settled that under Article III of the United States Constitution, a plaintiff must establish that a case or controversy exists between himself and the defendant and cannot rest his claim to relief on the legal rights or interests of third parties." *Smith v. Frye*, 488 F.3d 263, 272 (4th Cir. 2007) (affirming dismissal of a complaint for lack of standing). "Plaintiffs bear the burden of alleging: (1) a concrete and actual or imminent 'injury in fact;' (2) causation between the plaintiff's injury and the defendant's conduct; and (3) a likelihood that the requested relief will redress the alleged injury." *Doe v. Blue Cross Blue Shield, of Md., Inc.*, 173 F. Supp. 2d 398, 403 (D. Md. 2001) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "Plaintiffs must allege that they have been harmed in fact, not that they can imagine circumstances in which they could be affected." *Id.* "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560).

Plaintiffs do not allege (1) that Minor Plaintiff has ever once shared a bathroom or locker room with a transgender student; (2) that Minor Plaintiff has ever interacted in any way with a transgender student; or (3) that Defendants have ever withheld information about Minor Plaintiff from Parent Plaintiff. In other words, Plaintiffs do not allege that the Policies have impacted them in any tangible way. Rather, to establish standing, Plaintiffs rely on the anxiety they have allegedly suffered over the mere possibility that Minor Plaintiff might someday share a bathroom

or locker room with a transgender student. *See*, *e.g.*, Complaint ¶¶ 46, 55, 62, 75. This is insufficient.

As an initial matter, it is unclear why they would have any such anxiety, because Policy 443 makes clear that Minor Plaintiff is free to use "safe and nonstigmatizing alternative" facilities. *See* Exhibit 1 at 443.6. In any event, apprehension of future harm is insufficient to confer standing. *See*, *e.g.*, *Chambliss v. CareFirst, Inc.*, 189 F. Supp. 3d 564 (D. Md. 2016) ("[A]n objectively reasonable likelihood of harm is not enough to create standing, even if it is enough to engender some anxiety."); *Cohen v. Facebook, Inc.*, Case No. 16-cv-4453 (NGG)(LB), 2017 U.S. Dist. LEXIS 76701, at *14-15 (E.D.N.Y. May 18, 2017) ("[P]laintiffs cannot evade the required showing of an actual or imminent injury by alleging present harms incurred as a result of their fear of a hypothetical future harm that is not certainly impending, as doing so would allow parties to repackage their conjectural injury to manufacture standing."); *Lafferty v. Sch. Bd. of Fairfax Cnty.*, 798 S.E. 2d 164 (Va. 2017) (holding that plaintiffs challenging a school board's addition of "gender identity" and "gender expression" to its non-discrimination policy lacked standing, because "general distress over a general policy does not alone allege injury sufficient for standing, even in a declaratory judgment action").

Plaintiffs' allegation that "[o]ne child videoed minor Plaintiff and her friends in various stages of undressing in the bath facility during PE" (Complaint ¶45), does not change the analysis. This alleged incident apparently occurred before the Frederick BOE adopted the Policies, so it is not traceable in any way to the Policies. Plaintiffs also attempt to show concrete harm by alleging that "Minor Plaintiff does not participate in sports or other extracurricular activities that could require her to change her clothes or shower at her school because of this anxiety[.]" Complaint ¶ 47. The Supreme Court has rejected this theory of standing, holding that

plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

Accordingly, because Plaintiffs have not alleged that they suffered a concrete and actual or imminent injury in fact as a result of the Policies, there is no case or controversy between Plaintiffs and Defendants and the Court lacks jurisdiction over Plaintiffs' claims.

### C.        Plaintiffs Lack Standing To Assert A First Amendment Claim.

In addition to their other various constitutional, statutory, and common law theories, Plaintiffs bring a claim under the First Amendment challenging a perceived directive in the Policies for students to use transgender students' preferred pronouns. In the First Amendment context, "[f]or standing purposes, the plaintiff must show that the regulation presents a credible threat of enforcement against the party bringing suit that is not 'imaginary or wholly speculative.'" *Abbott v. Pastides*, Case No. 3:16-cv-538-MBS, 2017 U.S. Dist. LEXIS 106839, at *26 (D.S.C. July 11, 2017) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)). "Plaintiffs may bring a pre-enforcement suit when they can establish that they intend to engage in conduct that is proscribed by a statute, and that there exists some credible threat of enforcement thereunder." *Id.* "Plaintiffs must articulate a concrete plan to violate the law in question by giving details about their future speech such as when, to whom, where, or under what circumstances." *Id.* (internal quotations omitted). The allegations must be specific enough so that the court need not speculate on the types of speech or political activity in which the claimants intend to engage." *Id.* at *27. Plaintiffs do not meet this standard for two reasons.

First, Plaintiffs do not allege an intent to engage in conduct that violates the Policies. There is no allegation that Minor Plaintiff attends school with a student she knows or suspects to be transgender, that she will at any point interact with a transgender student, or that she intends

to use incorrect pronouns when referring to a transgender student. To the extent Plaintiffs are concerned that they will inadvertently use an incorrect pronoun to refer to a transgender student, they acknowledge that they have received confirmation from the Superintendent that mistakes are not prohibited by and would not be punishable under the Policies. *See* ECF No. 1-4 ("Students aren't subject to discipline when they make mistakes."). This failure to allege an intent to violate the Policies precludes a First Amendment challenge to the Policies. *See Abbott*, 2017 U.S. Dist. LEXIS 106839, at *26-27 (finding no standing where the speech at issue was not prohibited by the challenged sexual harassment and discrimination policy).

Second, Plaintiffs do not allege a credible threat of enforcement. As described above, there is not even an allegation that Minor Plaintiff attends any class or school activity with any transgender student. There is thus no allegation that she will be in a position to use an incorrect pronoun to refer to a transgender student, much less to be disciplined for it. And the Superintendent has disclaimed any intent to discipline Plaintiffs or other students for using incorrect pronouns to refer to transgender students, unless they are doing so "repeatedly . . . after being instructed about their mistake" or "with malice (like the intent to bully or harass)." ECF No. 1-4. The Fourth Circuit and other courts have previously found no standing in similar challenges to school policies. *See*, *e.g.*, *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 548-49 (4th Cir. 2010) (plaintiffs had no standing to challenge sexual harassment policy and student code of conduct, because there was no credible threat that the university would apply those policies to discipline plaintiffs for their anti-abortion message); *Abbott*, 2017 U.S. Dist. LEXIS 106839 at *27-31 (finding no credible threat of enforcement, and thus no standing, where the language of the policy at issue "makes it clear that the policy would not be applied to the speech in which Plaintiffs or similarly situated students intent to participate").

Accordingly, Plaintiffs lack standing to pursue any of the claims they have asserted in the Complaint, and the Court should dismiss the Complaint on this basis alone.

## IV.   THE COMPLAINT FAILS TO STATE A CLAIM.

### A.   Rule 12(b)(6) Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff is obligated to "provide the grounds of his entitlement to relief," including "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see also Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008); *Jackson v. State of Maryland*, No. JFM-10-463, 2010 U.S. Dist. LEXIS 64937, at \*2 (D. Md. June 30, 2010). Satisfying this obligation "requires more than labels and conclusions . . . [A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Although a court evaluating a motion to dismiss must assume that all facts in the complaint are true, the court need not accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), nor must it accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Conclusory assertions are insufficient to satisfy the requirements of Rule 12(b)(6). *See Giarratano*, 521 F.3d at 304.

### B.   Count One Fails To State A Claim For Violation Of A Constitutional Right To Privacy.

In Count One, Plaintiffs allege a constitutional right to not share bathrooms or locker rooms with transgender students under the substantive due process clause of the Fourteenth Amendment to the United States Constitution and Articles 5 and 24 of the Maryland Constitution's Declaration of Rights. As described below, no such right exists and, even if it did, Defendants have not violated it.

**1.      There Is No Constitutional Right To Not Share Restrooms And Locker Rooms With Transgender Students.**

"The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). The Supreme Court has held that, "in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the right to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Id.* at 720. But "the Court has always been reluctant to expand the concept of substantive due process because guide posts for responsible decision-making in this unchartered area are scarce and open-ended." *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992).

While Plaintiffs base their constitutional claims on an alleged right to privacy, "there is no general constitutional right to privacy; rather, the 'right to privacy' has been limited to matters of reproduction, contraception, abortion, and marriage, and none of these matters is implicated in the present case." *Edwards v. City of Goldsboro*, 178 F.3d 231, 252 (4th Cir. 1999); *see also Whalen v. Roe*, 429 U.S. 589, 607-08 (1977) (Stewart, J., concurring) ("In *Katz v. United States*, 389 U.S. 347, the Court made clear that although the Constitution affords protection against certain kinds of government intrusions into personal and private matters, there is no general constitutional right to privacy.") (internal quotation marks omitted).

Two federal courts have previously addressed whether public school students have a constitutional right not to share restrooms or locker rooms with transgender students whose sex assigned at birth was different than theirs, and both have held that no such right exists. In *Students & Parents for Privacy v. United States Department of Education*, Case No. 16-cv-4945, 2016 U.S. Dist. LEXIS 150011 (N.D. Ill. Oct. 18, 2016) ("*Students & Parents*"), Magistrate

15

Judge Jeffrey T. Gilbert denied a motion for a preliminary injunction that would have required a school district to segregate restrooms and locker rooms on the basis of students' sex assigned at birth. In an exhaustive analysis that is equally applicable to Plaintiffs' claims here, Magistrate Judge Gilbert stated:

> Generally speaking, the penumbral rights of privacy the Supreme Court has recognized in other contexts protect certain aspects of a person's private space and decision-making from governmental intrusion. Even in the context of the right to privacy in one's own body, the cases deal with compelled intrusion into or with respect to a person's intimate space or exposed body. No case recognizes a right to privacy that insulates a person from coming into contact with someone who is different than they are, or who they fear will act in a way that causes them to be embarrassed or uncomfortable, when there are alternative means for both individuals to protect themselves from such contact, embarrassment, or discomfort.

> Again, courts are very careful in extending constitutional protection in the area of personal privacy. Although the Supreme Court has recognized fundamental rights in regard to some special privacy interests, it has not created a broad category where any alleged infringement on privacy will be subject to substantive due process protection. In other words, "privacy" is not a magic term that automatically triggers constitutional protection. Instead, the same rules that govern every other substantive due process analysis apply in the privacy context. That means an asserted privacy right is not fundamental unless it is deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it was sacrificed. The list of rights that rise to this level is a short one. This list for the most part has been limited to matters relating to marriage, family, procreation, and the right to bodily integrity.

> In assessing the nature and scope of Plaintiffs' constitutional rights, and whether those rights have been infringed, the Court also must consider the need to preserve the discretion of schools to craft individualized approaches to difficult issues that are appropriate for their respective communities. Schools have the difficult task of teaching the shared values of a civilized social order. Our public education system has evolved to rely necessarily upon the discretion and judgment of school administrators and school board members. The Supreme Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.

> Even when confronting segregation, perhaps the most intractable problem ever to afflict our public schools, the Supreme Court emphasized that schools have the primary responsibility for elucidating, assessing, and solving problems that arise

during desegregation. Therefore, our Nation's deeply rooted history and tradition of protecting school administrators' discretion require that this Court not unduly constrain schools from fulfilling their role as a principal instrument in awakening the child to cultural values, in preparing him or her for later professional training, and in helping him or her to adjust normally to his or her environment.

It also is important to remember that constitutional privacy rights, whether rooted in the Fourth Amendment or the Fourteenth Amendment, are different in public schools than elsewhere. It is well established that public school students enjoy a reduced expectation of privacy in comparison to the public at large. Of particular relevance to this case, public school locker rooms in this country traditionally have been and remain not notable for the privacy they afford.

Contemporary notions of liberty and justice are inconsistent with the existence of the right to privacy asserted by Plaintiffs and properly framed by this Court. A transgender boy or girl, man or woman, does not live his or her life in conformance with his or her sex assigned at birth. . . . For all these reasons, high school students do not have a fundamental constitutional right not to share restrooms or locker rooms with transgender students whose sex assigned at birth is different than theirs.

*Id.* at *74-85 (internal citations and quotation marks omitted).

On August 25, 2017, Judge Edward G. Smith of the Eastern District of Pennsylvania confirmed Magistrate Judge Gilbert's analysis in *Doe v. Boyertown Area Sch. Dist.*, Case No. 17-cv-1249, 2017 U.S. Dist. LEXIS 137317 (E.D. Pa. Aug. 25, 2017) ("*Boyertown*"). He noted that "[t]he plaintiffs have not identified and this court has not located any court that has recognized a constitutional right of privacy as broadly defined by the plaintiffs." *Id.* at *135. Judge Smith went on to hold that, "[s]ince this matter does not involve any forced or involuntary exposure of a student's body to or by a transgender person, and the School District has instituted numerous privacy protections and available alternatives for uncomfortable students or to protect against the involuntary exposure of a student's partially clothed or unclothed body, the plaintiffs have not shown that the defendants infringed upon their constitutional privacy rights." *Id.* at *148-49. This analysis is equally applicable here and precludes Plaintiffs' Fourteenth Amendment substantive due process claim.

17

Plaintiffs also assert their constitutional privacy claim under Article 5 and Article 24 of the Maryland Constitution Declaration of Rights. Article 5 incorporates into Maryland law the English common law and statutes, as they existed on July 4, 1776, except where modified by legislative action or subsequent court decisions. Md. Dec. of R. art. 5. It does not grant any privacy rights beyond those found elsewhere in the United States and Maryland Constitutions. "Article 24 . . . is *in pari materia* with the Due Process Clause of the Fourteenth Amendment." *Doe v. Dep't of Pub. Safety & Corr. Servs.,* 971 A.2d 975, 982, 185 Md. App. 625, 636 (Md. Ct. Spec. App. 2009). Accordingly, Maryland courts routinely decline to interpret it more broadly than the Fourteenth Amendment. *See id.* And because the privacy right asserted by Plaintiffs is not protected by the Fourteenth Amendment, it is likewise not protected by Article 24.

### 2.       Even If There Were Such A Right, The Policies Do Not Infringe On It.

Even if Plaintiffs did have the right not to share bathrooms and locker rooms with transgender students, they would still need to show that Defendants infringed on that right. There is no allegation, however, that any Minor Plaintiff has ever shared a bathroom or locker room with a transgender student, and nothing in the Policies compels her to do so. Further, the Policies make available to Minor Plaintiff (and all other students) "safe and nonstigmatizing alternative facilities." As such, and as was the case in *Students & Parents*, "this case does not involve any forced or involuntary exposure of a student's body to or by a transgender person assigned a different sex at birth" and "Plaintiffs are not suffering a 'direct' and 'substantial' infringement on any substantive due process right." *Students & Parents*, 2016 U.S. Dist. LEXIS 150011, at *95.

### 3.       The Policies Do Not Shock The Conscience.

Even if Plaintiffs had the right not to share facilities with transgender students, and even if Defendants had infringed on that right, Plaintiffs would still need to show that Defendants' actions in enacting the Policies were "so egregious, so outrageous, that it may fairly be said to

18

shock the contemporary conscience" *Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999) (citing *County of Sacremento v. Lewis*, 423 U.S. 833, 847 n.8 (1998)).

As described above, Defendants enacted the Policies after receiving and in accordance with guidance from both the Maryland and United States Departments of Education. In doing so, they carefully balanced the needs and privacy interests of all students (transgender and cisgender) by, among other things, making "safe and nonstigmatizing alternative" facilities available to all students. Their actions thus do not "shock the conscience." *See Students & Parents*, 2016 U.S. Dist. LEXIS 15011 at *99 ("Therefore, the Court finds that neither the Restroom Policy nor the Locker Room Agreement shocks the conscience because they represent a careful and sensitive balancing of the interests of all the students in District 211.").

For all of these reasons, Plaintiffs privacy claims under the Maryland and United States Constitutions fail to state a claim.

**C.     Count Two Fails To State A Claim For Violation Of Title IX.**

In Count Two, Plaintiffs allege that Defendants created a hostile work environment for Minor Plaintiff in violation of Title IX by enacting a policy by which transgender individuals may use bathrooms and locker rooms consistent with their gender identities. "To establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007). Plaintiffs' Title IX claim fails to state a claim, because the facts alleged do not establish the second or third elements of a Title IX claim.

**1.      Plaintiffs Have Not Alleged Harassment Based On Sex.**

First, Plaintiffs have not alleged that Defendants have in any way harassed or treated Minor Plaintiff differently based on her sex. All students, whether male or female, transgender or cisgender, have the right under the Policies to use the facilities that correspond with their gender identities or to use alternative facilities if they so choose. And the Policies apply equally to the male and female restrooms and locker rooms. As such, the Policies do not discriminate against Plaintiffs in any way based on sex. *See Boyertown*, 2017 U.S. Dist. LEXIS 137317 at *162-67 ("The School District's similar treatment of all students is fatal to the plaintiffs' Title IX claim."); *Students & Parents*, 2016 U.S. Dist. LEXIS 150011 at *101-102 ("Therefore, the alleged discrimination and hostile environment that Girl Plaintiffs claim to experience is not on the basis of their sex, and any discomfort Girl Plaintiffs allege they feel is not the result of conduct that is directed at them because they are female.").[9]

**2.      Plaintiffs Have Not Alleged Severe, Pervasive, Or Objectively Offensive Harassment.**

Even if allowing transgender students to use facilities that correspond with their gender identities was somehow based on sex, it is not harassment at all, much less the severe, pervasive, or objectively offensive harassment required to maintain a Title IX claim. In the Title IX context:

> Harassment reaches the sufficiently severe or pervasive level when it creates an environment that a reasonable person would find hostile or abusive and that the victim herself subjectively perceives to be abusive. Whether gender-oriented harassment amounts to actionable (severe or pervasive) discrimination depends on a constellation of surrounding circumstances, expectations, and relationships. All the circumstances are examined, including the positions and ages of the harasser and victim, whether the harassment was frequent, severe, humiliating, or physically threatening, and whether it effectively deprived the victim of educational opportunities or benefits.

---

[9] By contrast, the policy that Plaintiffs would have Defendants adopt—barring transgender students from bathrooms and locker rooms that correspond to their gender identity—would discriminate against transgender students on the basis of sex. *See supra* at 5-6.

*Jennings*, 482 F.3d at 696 (internal citations omitted).

Here, Plaintiffs have not alleged any harassment whatsoever, as there is no allegation that Minor Plaintiff has ever used a restroom or locker room at the same time as a transgender student. She instead relies on her alleged apprehension about sharing these facilities with transgender students, but "[g]eneralized statements of fear and humiliation are not enough to establish severe, pervasive or objectively offensive conduct." *Students & Parents*, 2016 U.S. Dist. LEXIS 150011 at *104. And even if Minor Plaintiff were to share a restroom or locker room with a transgender student, "a reasonable person would not find the practice of allowing transgender students to use the locker rooms and bathrooms corresponding to their gender identity to be hostile, threatening, or humiliating." *Boyertown*, 2017 U.S. Dist. LEXIS 137317 at *178; *see also Students & Parents*, 2016 U.S. Dist. LEXIS 150011 at *105 ("The mere presence of a transgender student in a restroom or locker room does not rise to the level of conduct that has been found to be objectively offensive, and therefore hostile, in other cases.").

Accordingly, Plaintiffs fail to state a claim for harassment under Title IX.

### D.    Count Three Fails To State A Claim For Invasion Of Privacy – Intrusion Upon Seclusion.

In Count Three, Plaintiffs assert a common law claim for "intrusion upon seclusion," based on the prospect that Minor Plaintiff someday might be in a bathroom or locker room at the same time as a transgender student. "The elements of this tort are intentional intrusion upon another person's solitude, seclusion, private affairs or concerns in a manner which would be highly offensive to a reasonable person." *Trundle v. Homeside Lending, Inc.*, 162 F. Supp. 2d 396, 401 (D. Md. 2001). "Maryland case law makes clear that intrusion upon seclusion depends upon a person's reasonable expectation of privacy[.]" *Webb v. Green Tree Servicing, LLC*, Civil

Action No. ELH-11-2105, 2011 U.S. Dist. LEXIS 141806, at *36 (D. Md. Dec. 9, 2011). Plaintiffs' intrusion upon seclusion claim fails for three reasons.

First, Plaintiffs do not allege that any Defendant intruded upon their seclusion. Rather, they speculate that the Policies enacted by Defendants somehow might cause someone else to intrude upon Minor Plaintiff's seclusion in the future. In *New Summit Associates L.P. v. Nistle*, 533 A.2d 1350, 73 Md. App 351 (Md. Ct. Spec. App. 1987), the Court of Special Appeals held that a landlord could not be liable for an intrusion upon seclusion where a tenant discovered peepholes allowing an unknown perpetrator to view her in her private bathroom, because "[t]here was no proof that the invasion of appellee's privacy was committed by any agent, servant, or employee of either of the appellants." *Id.* at 1354. It did not matter that a jury found the landlord negligent in not correcting a known issue of construction workers at the apartment complex carving peepholes, because "[a]bsent evidence of [the landord's] intentional participation in the invasion, there is no basis upon which [the landlord] can be held liable on this theory." *Id.* Here, Plaintiffs have not alleged that any Defendant has intentionally invaded their privacy. In fact, Plaintiffs have not alleged any invasion of privacy at all; they merely speculate that the Policies might lead to an invasion of Minor Plaintiff's privacy in the future. Moreover, Minor Plaintiff can avoid the supposed invasion of her privacy by availing herself of the safe and non-stigmatizing alternative facilities available to her under Policy 443.

Second, there is no reasonable expectation of privacy in the common areas of a restroom or locker room. As noted in *Boyertown*, cases that have found an intrusion upon seclusion in bathrooms "involved an intrusion into a single bathroom stall and not the presence of someone in the common area of a multi-user facility." *Boyertown*, 2017 U.S. Dist. LEXIS 137317 at *189. "As for locker rooms generally, 'public school locker rooms are not notable for the privacy they

afford.'" *Id.* at *190 (citing *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995)); *see also Craig v. M&O Agencies, Inc.*, 496 F.3d 1047, 1061 (9th Cir. 2007) (affirming summary judgment on an invasion of privacy claim because the plaintiff "had no reasonable expectation of privacy in the common area of the restroom, where she would expect her conduct to be observed by other individuals in the restroom"). Plaintiffs make no allegation that the Policies would lead to an intrusion upon their seclusion in the private areas of restrooms or locker rooms, such as individual toilet stalls.

Third, the alleged intrusion upon seclusion, *i.e.*, a transgender person using a restroom or locker room at the same time as Minor Plaintiff, is not highly offensive to a reasonable person. Indeed, this was a primary reason why the court in *Boyertown* found no likelihood of success on the merits with respect to a nearly identical invasion of privacy claim:

> [T]he court does not find that a reasonable person would be offended by the presence of a transgender student in the bathroom or locker room with them, despite the possibility that the transgender student could possibly be in a state of undress . . . . In addition, the mere presence of a transgender student in the common area of the girls' bathroom washing hands . . . is also not objectively offensive to a reasonable person."

*Boyertown*, 2017 U.S. Dist. LEXIS 137317 at *191. Plaintiffs thus fail to state a claim for intrusion upon seclusion.

### E.    Count Four Fails To State A Claim For Violation Of The First Amendment.

In Count Four, Plaintiffs claim that Defendants are violating their First Amendment rights by requiring Minor Plaintiff to refer to her fellow students with pronouns consistent with their gender identities. In other words, Plaintiffs claim a constitutional right to harass and demean transgender students by using the wrong pronouns. This claim fails for a number of reasons, not the least of which is that no such constitutional right exists.

1.     **The Policies Do Not Prohibit Plaintiffs From Voicing Their Opinion On Any Issue, Including Gender Identity Issues.**

In their attempt to manufacture a restriction on their First Amendment rights, Plaintiffs overstate the scope of the Policies. The Policies do not, as Plaintiffs contend, "forc[e] Plaintiff Mary Smith to be silent as to her speech on issues of women's rights and the public interest." Complaint ¶ 149. Rather, Policy 443 "recognizes the right of every student to be referred to by their preferred name and pronoun" and directs staff members "to use [preferred names and pronouns] in every interaction, unless the interaction could compromise student privacy." Exhibit 1 at 443.5(a). Policy 443 does not address the use of preferred names or pronouns by other students. Policy 437 likewise does not explicitly address the use of preferred names or pronouns by other students, but it does generally prohibit bullying, harassment, or intimidation. Its prohibition is limited, however, to intentional conduct that creates a hostile educational environment that is motivated by an actual or a perceived personal characteristic (including gender identity and gender expression) or that is threatening or seriously intimidating. Exhibit 3 at 437(B). It is also limited to conduct that "occurs on school property, at a school activity or event, or on a school bus," or that "substantially disrupts the orderly operation of a school." *Id.* In other words, Plaintiffs remain free to voice their opinions on "issues of women's rights and the public interest," including issues relating to gender identity, at school and elsewhere.

2.     **The First Amendment Does Not Give Plaintiffs The Right To Target Transgender Students For Harassment By Intentionally Calling Them By Incorrect Names And Pronouns.**

"While students retain significant First Amendment rights in the school context, their rights are not coextensive with those of adults." *Kowalski v. Berkeley County Schs.*, 652 F.3d 565 (4th Cir. 2011). The Supreme Court has recognized that schools may limit speech, among other reasons, when it "colli[des] with the rights of other students to be secure and to be let alone."

24

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969). The Fourth Circuit has thus recognized that "public schools have a 'compelling interest' in regulating speech that interferes with or disrupts the work and discipline of the school, including discipline for student harassment and bullying." *Kowalski*, 652 F.3d at 572. Indeed, "schools have a duty to protect their students from harassment and bullying in the school environment." *Id.*

Here, Plaintiffs' right to voice their opinion on gender identity issues is not in question.[10] Rather, Plaintiffs are asking the Court to authorize them to target transgender students for harassment and bullying by using incorrect pronouns when speaking to those students.[11] In *Kowalski*, the Fourth Circuit held that, "[g]iven the targeted, defamatory nature of [the plaintiff's] speech, aimed at a fellow classmate, it created 'actual or nascent' substantial disorder and disruption in the school." *Kowalski*, 652 F.3d at 574. Accordingly, the speech at issue in *Kowalski* was held not to be protected by the First Amendment. *See id.* So too here.

### F.    Count Five Fails To State A Claim For Violation Of The Fourteenth Amendment.

In Count Five, Plaintiffs allege that Defendants might somehow violate the Fourteenth Amendment by withholding information about a student's gender identity from the student's parents. It is unclear why Plaintiffs are asserting this claim or how they contend that they have

---

[10]     Plaintiffs claim that they are forced "to use the gender pronouns that the school or a fellow student demands, regardless of the actual sex of the student." Complaint ¶ 148. This statement confuses and conflates the separate concepts of sex and gender identity. To the extent Plaintiffs are implying that so-called "actual sex" is a fixed trait that can never change, they are mistaken. Indeed, in 2015, the Maryland General Assembly passed a law making it easier for transgender individuals to receive new birth certificates with sex designations that differ from the sex designated on their original birth certificates. *See* Md. Code, Health § 4-211(b).

[11]     A recent nationwide survey of more than 10,000 students between the ages of 13 and 21 highlighted the psychological harm that transgender students face when subjected to such harassment and bullying. For example, "LGBTQ students who experience victimization and discrimination are more likely to have lower educational aspirations, lower grades, and higher absenteeism. They are also more likely to experience school discipline, which can result in pushing students out of school, and at times, into the criminal justice system." *See* 2015 National School Climate Survey, GLSEN, *available at* https://www.glsen.org/article/2015-national-school-climate-survey (last visited Oct. 11, 2017).

standing to do so, because there is no allegation that Minor Plaintiff is transgender or that Defendants have withheld information about her gender identity from Parent Plaintiff. In any event, Count Five fails to state a claim.

First, the Policies simply do not say that the Frederick County Public Schools may withhold information about transgender students from the students' parents. Plaintiffs base their claim on alleged statements by board members at an August 9, 2017, meeting of the Frederick BOE. *See* Complaint ¶¶ 154-161. The alleged statements are misquoted, taken out of context, and do not accurately reflect the discussion at that meeting. They are also irrelevant, because the text of the Policies governs how the school handles issues in the future, not statements allegedly made by board members in the process of drafting and adopting the Policies.

Policy 443 states that "FCPS will ensure all personally identifiable and medical information relating to transgender and gender nonconforming students will be kept confidential according to applicable federal, state and local privacy and student records laws." Exhibit 1 at 443.4 (emphasis added). The Family Educational Rights and Privacy Act ("FERPA") requires that federally-funded schools give parents "the right to inspect and review the education records of their children." 20 U.S.C. § 1232g(a)(1)(A). Maryland regulations likewise provide that "[r]ecords of a student maintained under the provisions of this title, including confidential records, shall be available to that student's parent or parents . . . or legal guardians in conference with appropriate school personnel." COMAR 13A.08.02.04(C). Plaintiffs even concede in the Complaint that the Frederick BOE stated at the meeting on August 9, 2017, that the Policy and its implementing regulation would "compl[y] with 'FERPA and state law' to 'Respect parental rights' because 'they have to, it is the law." Complaint ¶ 159.

Regulation 400-36 elaborates on parents' right to receive information about transgender students. It states:

> Every effort shall be made to encourage and support communication between transgender and gender nonconforming students and the student's parent/guardian. School staff may offer to meet jointly with the parent/guardian and the student at school. School staff shall work to both support student needs as well as respect the rights of the parent/guardian to have access to student records in compliance with federal and state law. Parents/Guardians will be contacted any time there is a health or safety concern regarding the student.

Exhibit 2 at II(F). In other words, Regulation 400-36 encourages dialogue between transgender students and their parents and guardians. It also includes a footnote referencing Regulation 400-20, which contains the Frederick BOE's policies and procedures for parents obtaining copies of student records in compliance with the relevant FERPA and COMAR provisions. *See* Exhibit 2 at III(F) n.2. Plaintiffs are thus challenging an imagined policy that is the opposite of what Defendants enacted.

Second, even if Policy 443 or Regulation 400-36 did require the Frederick County Public Schools to withhold information from parents, Parent Plaintiff's right to receive educational records is governed by the relevant FERPA and COMAR provisions. There is no authority extending the Fourteenth Amendment to give parents a constitutional right to access educational records. *See Fay v. S. Colonie Cent. Sch. Dist.*, No. 83-CV-1026, 1985 U.S. Dist. LEXIS 18223, at *17 n.6 (N.D.N.Y. July 3, 1985) ("That no constitutional right of access to these school documents exists is supported further by the fact that Congress passed FERPA in order to assure that parents were granted access to their children's 'educational records.'").

### G.    Count Six Fails To State A Claim, Because Policies 443 and 447 Do Not Violate The Separation of Powers Doctrine.

Plaintiffs' Count Six appears to challenge the authority of the Frederick BOE to enact policies such as Policy 443 based on various articles in the Maryland Constitution and English

27

common law notions of the separation of powers. Count Six has no basis in law, because the Maryland Constitution and the Maryland General Assembly have together delegated to the Frederick BOE the authority to enact policies such as Policy 443.

Section 1 of Article 8 of the Maryland Constitution provides that "[t]he General Assembly, at its First Session after the adoption of this Constitution, shall by Law establish throughout the State a thorough and efficient System of Free Public Schools; and shall provide by taxation, or otherwise, for their maintenance." The General Assembly has done that, mandating that "[t]here shall be throughout this State a general system of free public schools according to the provisions of this article." Md. Code, Educ. § 1-201.

In furtherance of its creation of a "general system of free public schools," the General Assembly created county boards of education, including the Frederick BOE, and vested them with the authority to manage and set policies for the county school systems. *See* Md. Code, Educ. § 4-108. Specifically, the General Assembly mandates that each county board:

(1)  To the best of its ability carry out the applicable provisions of this article and the bylaws, rules, regulations, and policies of the State Board;

(2)  Maintain throughout its county a reasonably uniform system of public schools that is designed to <u>provide quality education and equal educational opportunity for all children</u>;

(3)  Subject to this article and to the applicable bylaws, rules, and regulations of the State Board, <u>determine, with the advice of the county superintendent, the educational policies of the county school system</u>; and

(4)  Adopt, codify, and make available to the public bylaws, rules, and regulations not inconsistent with State law, for the conduct and management of the county public schools.

*Id.* (emphasis added).

In other words, the General Assembly has delegated to the Frederick BOE the authority to provide equal educational opportunity for all children, transgender and cisgender, and to

28

determine the educational policies of the Frederick County Public Schools. That is precisely what the Frederick County BOE did when it enacted the Policies. And Maryland courts have long recognized the validity of the state's delegation of authority to local school boards. *See*, *e.g.*, *Wiley v. Board of County School Comm'rs*, 51 Md. 401, 404-05 (1879) ("Where the Legislature has confided the power of determining as to the wisdom and expediency of an act authorized to be done, to a board of public functionaries, with them the decision of the question must rest."). Accordingly, Plaintiffs' claim that the Policies violate principles of separation of powers has no merit.

### H.      Count Seven Fails To State A Claim, Because Allowing Transgender Students To Use Facilities Consistent With Their Gender Identities Does Not Violate Applicable Building Codes.

In Count Seven, Plaintiffs claim that the Frederick BOE exceeded its authority by purporting to modify applicable building codes, citing four statutes that all relate in some form to the construction of school facilities.[12] This argument is frivolous. Nothing in any of the four statutes cited "mandat[es] bathrooms and locker rooms to be identified by and used by members of the male and female sex and not, from time to time, by self-actualization or identity of students." Complaint ¶ 177. Building codes simply have no bearing on whether transgender students may use facilities consistent with their gender identities, nor do they provide any basis for a cause of action against Defendants. *See Doe v. Reg'l Sch. Unit 26*, 86 A.3d 600, 605 (Me. 2014) (A statutory requirement to provide bathrooms that are "separated according to sex" "does

---

[12]      Maryland Code, Educ. § 2-205 outlines the powers and duties of the State Board of Education and specifies that "the State Board shall establish standards and guides for planning and constructing school building projects." Md. Code. Educ. § 2-205(l)(1). Maryland Code., Educ. § 4-117(b)(1) requires that construction or remodeling of buildings by county school boards "shall conform to all applicable State and county building, electrical, fire, and plumbing regulations and codes." Maryland Code, Educ. § 5-301 relates to the funding of public school construction and capital improvements. Maryland Code, Pub. Safety § 12-503 generally requires the Maryland Department of Housing and Community Development to adopt the International Building Code; it does not impose requirements on any other individuals or entities.

not purport to establish guidelines for the *use* of school bathrooms. Nor does it address how schools should monitor which students use which bathroom, and it certainly offers no guidance concerning how gender identity relates to the use of sex-separated facilities.") (emphasis in original).

## I.    Count Eight Fails To State A Claim For "Unconstitutionality of State Statutes And Board of Education Policies 437 and 443."

It is unclear what Plaintiffs are alleging in Count Eight. This count is titled "Unconstitutionality of State Statutes and Board of Education Policies 437 and 443," but Plaintiffs do not specify which statutes they claim are unconstitutional and do not specify the provisions in the Maryland or United States Constitutions that these statutes and policies purportedly violate.

Plaintiffs specifically refer in Count Eight to Maryland Code, Education § 7-424. This statute requires county boards of education to provide reports on incidents of bullying, harassment, or intimidation against students attending public schools, including incidents that are motivated by gender identity. *See* Md. Code, Educ. § 7-424. Plaintiffs do not explain how this statute might be unconstitutional or why the alleged unconstitutionality of this statute would have any bearing on the challenged Policies.

Plaintiffs also refer in Count Eight to Maryland Code, Education § 7-301. This statute generally requires children in Maryland between the ages of 5 years old and 18 years old to attend public schools, subject to numerous exceptions. Plaintiffs do not explain how this statute might be unconstitutional and, in fact, courts have already affirmed its constitutionality. *See*, *e.g.*, *Battles v. Anne Arundel County Bd. of Educ.*, 904 F. Supp. 471, 475-76 (D. Md. 1995) (compulsory education law does not violate the First Amendment); *In re Jeannette L.*, 71 Md.

App. 70, 81-84, 523 A.2d 1048, 1054-56 (1987) (compulsory education law is not unconstitutionally vague). Count Eight, therefore, fails to state a claim.

## V.      CONCLUSION

Defendants have balanced numerous perspectives to enact Policies that create equal educational opportunity for all students, regardless of their gender identities. Plaintiffs, on the other hand, want the Court to turn existing protections against discrimination on their head and to hold that only cisgender students have the right to use safe, non-stigmatizing facilities in the Frederick County Public Schools. As described above, each of their constitutional, statutory, and common law theories fails to state a claim. Therefore, the Court should dismiss the Complaint with prejudice.

Dated: October 20, 2017                          Respectfully submitted,


                                                   /s/
                                                 Donald English, Jr. (Bar No. 27534)
                                                 Keith D. Hudolin (Bar No. 13688)
                                                 JACKSON LEWIS P.C.
                                                 2800 Quarry Lake Drive, Suite 200
                                                 Baltimore, Maryland 21209
                                                 410.415.2000 (T)
                                                 410.415.2001 (F)
                                                 Donald.English@jacksonlewis.com
                                                 Keith.Hudolin@jacksonlewis.com

                                                 *Counsel for Defendants*